UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

AMANDA FLANNERY,

                                                      Plaintiff,

         - against -

THE CITY OF ROCHESTER, a municipal entity, PAUL
ROMANO, "JOHN DOE POLICE OFFICERS 1-200"
(names and number of whom are unknown at present),
COUNTY OF MONROE, TODD BAXTER, "RICHARD
ROE SHERIFF'S DEPUTIES 1-200" (names and number
of whom are unknown at present), and other unidentified
members of the Rochester Police Department and Monroe
County Sheriff's Office,

                                                      Defendants.

**DECLARATION OF
PEACHIE L. JONES,
ESQ.**

 Case no: 22-cv-6101

---

Peachie L. Jones, Esq., declares and says:

1.       I am a Municipal Attorney for the City of Rochester, admitted to practice law in the State of
         New York and before this Court, and am fully familiar with all of the facts and
         circumstances surrounding this matter, including those set forth herein.

2.       I submit this Declaration in support of Defendants City of Rochester and Paul Romano's
         Motion to Partially Dismiss the Amended Complaint pursuant to FED. R. CIV. P. 12(b)(6).

3.       The information set forth herein is based upon my personal knowledge, a review of the
         proceedings in this action, and a review of relevant case law.

4.       Plaintiff filed a Summons and Amended Complaint in Monroe County Supreme Court
         February 2, 2022, and subsequently served it on Defendants City of Rochester and Paul
         Romano. The Summons and Amended Complaint is appended hereto as Exhibit A.

5.       Defendant City removed the matter to the Western District of New York on March 1, 2022.

Dated: March 3, 2022                     _____
                                         PEACHIE L. JONES, ESQ.

# Exhibit A

Exhibit A

# Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

AMANDA FLANNERY,

                                        Plaintiff,

                    -against-

THE CITY OF ROCHESTER, a municipal entity, PAUL ROMANO, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,

                                        Defendants.

**SUMMONS**

Index No.: E2021008134

The basis of venue is:
Location of the incident

Plaintiff designates Monroe County as the place of trial.

**To the above named Defendants:**

**You are hereby summoned** to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorneys within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner.  In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED: New York, New York
          February 2, 2022

                              Yours, etc.,

                              ~//s//~
                              _____
                              ROTH & ROTH, LLP.
                              ELLIOT SHIELDS, ESQ.
                              Attorney for Plaintiff
                              192 Lexington Ave, Suite 802
                              New York, New York 10016
                              (212) 245-1020

                              EASTON THOMPSON
                              KASPEREK SHIFFRIN LLP
                              Donald Thompson
                              16 West Main Street, Suite 243

Rochester, New York 14614
Ph: (585) 423-8290

TO:
CITY OF ROCHESTER
CORPORATION COUNSEL
30 Church Street
Rochester, New York 14614

PAUL ROMANO
185 Exchange Boulevard
Rochester, New York 14614

COUNTY OF MONROE
Monroe County Law Department
307 County Office Building
39 W. Main St.
Rochester, NY 14614

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

AMANDA FLANNERY,

                                              Plaintiff,

                    -against-

THE CITY OF ROCHESTER, a municipal entity, PAUL
ROMANO, "JOHN DOE POLICE OFFICERS 1-200"
(names and number of whom are unknown at present),
COUNTY OF MONROE, TODD BAXTER, "RICHARD
ROE SHERIFF'S DEPUTIES 1-200" (names and number of
whom are unknown at present), and other unidentified
members of the Rochester Police Department and Monroe
County Sheriff's Office,

                                            Defendants.

INDEX NO.: E2021008134

**AMENDED VERIFIED**
**COMPLAINT**
**[JURY TRIAL DEMANDED]**

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON

KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

I.     **PARTIES**

1.      Plaintiff AMANDA FLANNERY is a resident of the City of Rochester, State of

New York.

2.      Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and

authorized under the laws of the State of New York. It is authorized by law to maintain a police

department, which acts as its agent in the area of law enforcement and for which it is ultimately

responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force

and the employment of police officers as said risks attach to the public consumers of the services

provided by the RPD.

3.      Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation

duly organized and existing under and by virtue of the laws of the State of New York. Defendant

CITY maintains the City of Rochester Police Department, a duly authorized police department,

authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.    PAUL ROMANO and "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.    Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

6.    Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

7.    "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and

under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

8.      BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II.  JURISDICTION

9.      This action falls within one or more of the exceptions as set forth in CPLR Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having acted in reckless disregard for the safety of others, as well as having performed intentional acts.

10.     Ms. FLANNERY sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

11.     Ms. FLANNERY filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

12.     The CITY held a 50-h hearing on May 6, 2021 and the COUNTY waived its 50-h hearing for Ms. FLANNERY.

13.     More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

14.     This action was brought within a year of the event that gives rise to Ms. FLANNERY's causes of action under New York State law and Plaintiffs have complied with all of the statutory prerequisites for bringing this action.

## III.  STATEMENT OF FACTS

### A.  Facts Common to All Causes of Action.

15.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call

for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

16.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

17.     On September 2-6, 2020, and thereafter, pursuant to policy, the defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

18.     The defendant RPD officers and Sheriff's Deputies—pursuant to policy— retaliated against Ms. Flannery and other protesters based on the message they were expressing—calling for an end to racist police violence against Black and brown people.

19.     The Defendant RPD officers and Sheriff's deputies—pursuant to policy—also targeted and attacked Ms. Flannery in retaliation for her filming them on certain nights: in fact, as detailed below, on the night of September 3-4, 2020, Defendant ROMANO was targeted her and shot directly in the head from close range with a pepper ball in retaliation for her filming and documenting Defendants' violent response to the protests.

20.     As detailed below, all of Ms. Flannery's injuries, resulted from the unlawful municipal policies of the City, RPD, County and Sheriff TODD BAXTER. These policies were

developed by former RPD Chief La'Ron Singletary, who was the policymaker for the City and RPD, and Defendant BAXTER, who was the policymaker for the County and MCSO.

21.     As detailed below, prior to the protests beginning on September 2, 2020, the City and RPD and the COUNTY and BAXTER developed an unlawful unified protest response plan, which trained, instructed and required RPD officers and Sheriff's Deputies to respond to the protests with extreme and unnecessary violence, including the indiscriminate use of pepper balls, tear gas and other chemical weapons; to retaliate against protesters based on the message they were expressing; and to retaliate against journalists, legal observers and others who were filming and/or documenting the law enforcement response to protesters.

22.     Chemical weapons, like tear gas, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. Chemical Weapons can cause severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

23.     Warnings on the websites of the companies that manufactured and distributed the chemical weapons used by Defendants against Plaintiff and others at the protests, and on the chemical weapons themselves, explicitly state that they can cause damage to the female reproductive system.

24.     For Ms. Flannery, exposure to the chemical weapons on September 2-6, 2020 by Defendants caused menstrual irregularities.

25.     Ms. Flannery also suffered other severe and permanent physical and psychological injuries, some of which are detailed herein.

**Wednesday September 2, 2020**

26.     On Wednesday September 2, 2020, after Joe Prude and Free the People Rochester held a press conference releasing the Body Worn Camera video of RPD officers brutally killing Daniel Prude, word spread about the fact that RPD had killed Daniel Prude and then covered up his death for almost six months.

27.      People assembled outside of the Public Safety Building ("PSB"). Immediately, defendants closed Exchange Boulevard in front of the PSB to vehicular traffic.

28.     Meanwhile, the City and RPD developed and implemented a strategy to silence this peaceful and lawful exercise of rights—this included calling in the State Troopers and Sheriff's Deputies to assemble a massive police presence. This coordinated strategy validated and encouraged the use of intimidation, excessive force, and illegal arrests by RPD officers during the protests.

29.     On Wednesday September 2, 2020, Ms. FLANNERY attended a peaceful protest in front of the PSB.

30.     When she arrived, Defendants had already closed Exchange Boulevard in front of the PSB to vehicular traffic.

31.     At approximately 5:00 p.m., in the street in front of PSB, RPD Officers and/or Sheriff's Deputies shot Ms. FLANNERY with pepper balls and sprayed her with other chemical weapons, including pepper spray and/or tear gas.

32.     An RPD Officer and/or Sheriff's Deputy pepper sprayed Ms. FLANNERY directly in the face without cause or justification.

33.     Ms. FLANNERY had not committed any crime or violation; had not touched the police barricades; had not thrown anything at the police; and had not committed any other act

that would have led a reasonable officer to believe they had cause or legal justification to use any force whatsoever against Ms. FLANNERY.

34. The officers lacked cause or justification to use any "less-than-lethal" or chemical weapons against Ms. FLANNERY.

35. Defendants never made an individualized determination that they had cause or legal justification to use force against Ms. FLANNERY; instead, the use of force was based on perceived "group conduct."

36. Defendants' used force against Ms. FLANNERY retaliate against her and other protesters based on their objection to the message protesters were expressing: to call for justice for Daniel Prude, to uphold the sanctity of Black lives and call for an end to racist policing.

37. As a result of the chemical weapons Defendants used against her on September 2, 2020, Ms. FLANNERY sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

38. Ms. FLANNERY also sustained pain, bruising and swelling from being shot with pepper balls and emotional and psychological harm from being attacked by the RPD officers and Richard Roe Sheriff's Deputies.

**Thursday September 3 to Friday September 4, 2020**

39. On the night of Thursday, September 3 to Friday September 4, 2020, Ms. FLANNERY participated in the peaceful protest in the vicinity of the PSB.

40. Plaintiff was again assaulted and battered by RPD officers and/or Sheriff's Deputies on the night of Thursday, September 3 to Friday September 4, 2020 at the peaceful protest in the vicinity of the PSB.

41.     Prior to her arrival, Defendants had erected barricades and closed Exchange Boulevard in the vicinity of the PSB to vehicular traffic.

42.     According to the New York Times: "People were sitting, singing, chanting, and eating pizza. At around 10:30 p.m., the dozen or so police officers who had been monitoring the demonstrators from behind a barricade were joined by around 20 reinforcements in riot gear. The officers suddenly surged toward the barricade and began firing an irritant into the crowd. It was unclear what led them to do so."

43.     At approximately 10:30 p.m., in the vicinity of the sidewalk near the flagpole in front of the PSB, Ms. FLANNERY was shot with pepper balls in the torso and legs by RPD officers and/or Sheriff's Deputies, without cause or legal justification.

44.     Ms. FLANNERY was also subjected to a large amount of chemicals from pepper spray and/or tear gas by RPD officers and/or Sheriff's Deputies.

45.     Ms. FLANNERY had not committed any crime or violation; had not touched the police barricades; had not thrown anything at the police; and had not committed any other act that would have led a reasonable officer to believe they had cause or legal justification to use any force whatsoever against Ms. FLANNERY.

46.     Instead, the RPD officers and/or Sheriff's Deputies shot Ms. FLANNERY and subjected her to chemical weapons based on perceived "group conduct".

47.     The officers lacked cause or justification to use any force or chemical weapons against Ms. FLANNERY.

48.     The RPD officers violated RPD policy by shooting pepper balls at a Plaintiff's upper body.

49.     Throughout their incident reports and Subject Resistance Reports, RPD officers repeatedly state that the "Blue Light Cameras" that are owned by the City captured the events that unfolded that night in front of the PSB. However, in response to a Freedom of Information Law Request, the City and RPD admitted that they destroyed the videos—despite being put on notice by receipt of a preservation letter on September 14, 2020 (well within the 30-day retention period), that all Blue Light Camera recordings must be preserved as they are relevant to the instant litigation and other cases arising from the violent police response on that night (and other nights of the protests).

50.     The City and RPD, upon information and belief, deliberately deleted and/or failed to preserve the Blue Light Camera footage because it clearly demonstrated their violent and unlawful response to the protests.

51.     Thereafter, Defendants pushed and shoved Ms. FLANNERY and others with their hands and batons from the vicinity in the front of the PSB, forcing them South on Exchange Boulevard to the vicinity of the Center City Bridge.

52.     After permitting protesters to remain in the vicinity of the Center City Bridge for some time, suddenly and without warning, Defendants began to violently attack Plaintiff and other protesters: hitting them with batons, attacking them with chemical weapons, and shooting them from close range with Pepperballs and other projectiles.

53.     On September 4 at approximately 12:50 a.m., on Exchange Blvd. south of the Center City Bridge, while filming the RPD officers and Sheriff's Deputies and complying with their orders to "move back", Defendant PAUL ROMANO shot Ms. FLANNERY in the head with a pepper ball from approximately 10 feet away:



54.     ROMANO lacked cause or any legal justification for shooting Ms. FLANNERY

in the head.

55.     When ROMANO shot Ms. FLANNERY in the head, she had not committed any

crime or violation; had not thrown anything at the police; and had not committed any other act

that would have led a reasonable officer to believe they had cause or legal justification to use any force whatsoever against Ms. FLANNERY.

56.     ROMANO shot Ms. FLANNERY in the head in retaliation for her filming the RPD Officers and Sheriff's Deputies police the protesters.

57.     ROMANO shot Ms. FLANNERY in the head in retaliation for the viewpoint expressed by the protesters, who were calling for an end to racist policy violence against Black and brown people in Rochester.

58.     As a result of the chemical weapons Defendants used against her on September 3-4, 2020, Ms. FLANNERY sustained irritation to their skin, eyes, mouth, nose and lungs and menstrual irregularities.

59.     As a result of being shot in the head by ROMANO, Ms. FLANNERY sustained a concussion.

60.     Ms. FLANNERY also sustained pain, bruising and swelling from being shot with pepper balls, and emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

**Friday September 4 to Saturday September 5, 2020**

61.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" hundreds of protesters, including Ms. FLANNERY, spray them with tear gas, and attack them with pepper balls – a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama.

62.     RPD officers first escorted peaceful protesters along Court Street from Martin Luther King Jr. Memorial Park towards the Public Safety Building ("PSB") and directed them onto

the Court Street Bridge. But when protesters reached the other side, law enforcement stopped them with metal barricades.

63.     Defendants had closed the street to vehicular and pedestrian traffic.

64.     Defendants inhibited the freedom of movement of Plaintiff and other protesters by stopping them with metal barricades and trapping them on the bridge.

65.     After hundreds of protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." However, the dispersal orders were not clearly communicated, and the protesters towards the back of the bridge near South Avenue could not hear the dispersal orders. Moreover, there was nowhere for the protesters in the front near the police barricades to go.

66.     When the RPD officers issued dispersal orders at on September 4 at approximately 10:43 p.m., Ms.  FLANNERY was trapped in the middle of the bridge and it was physically impossible for her to immediately comply and leave the bridge.

67.     Less than 30 seconds after the RPD officers issued dispersal orders—pursuant to policy—Ms. FLANNERY and other protesters were attacked by the RPD Officers and Sheriff's Deputies with large amounts of chemical weapons.

68.     Ms. FLANNERY was shot with pepper balls in the legs and body by the RPD Officers and/or Sheriff's Deputies.

69.     The RPD Officers and Sheriff's Deputies also deployed tear gas and other chemical weapons, which harmed Ms. FLANNERY.

70.     At no time did Ms. FLANNERY commit any crime or violation.

71.     At no time did Ms. FLANNERY threaten police in any way.

72.     The RPD Officers lacked cause or any justification to or use "chemical weapons" or any physical force against Ms. FLANNERY.

73.     Any no time did Defendants make an individualized determination that they had cause or legal justification to use force against Ms. FLANNERY; instead, the use of force was based on perceived "group conduct."

74.     Defendants trapped Ms. FLANNERY and others on the bridge and used grossly excessive force against them in retaliation for the message that they were expressing—calling for an end to the decades of racist policing in the Rochester Police Department.

75.     As a result of the chemical weapons Defendants used against her on September 4-5, 2020, Ms. FLANNERY sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

76.     Ms. FLANNERY also sustained physical pain from being shot with pepper balls, and emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

**Night of Saturday September 5 to Sunday September 6, 2020**

77.     On the night of Saturday, September 5-6, 2020, Ms. FLANNERY participated in the peaceful protest in downtown Rochester.

78.     Plaintiff was again assaulted and battered by RPD officers and/or Sheriff's Deputies on the night of Saturday September 5-6, 2020, at the peaceful protest in downtown Rochester.

79.     Police escorted protesters as they marched on the City's streets, until they approached the intersection of Broad Street and Exchange Boulevard.

80.     Defendants had closed the intersection of Broad Street and Exchange Boulevard to vehicular and pedestrian traffic prior to Plaintiff and other protesters approaching that intersection.

81.     When Plaintiff and other protesters approached the intersection of Broad Street and Exchange Boulevard, they were met with an overwhelming presence of RPD officers, Sheriff's deputies and State Police in full riot gear with military grade weapons—including a bearcat tank—and police dogs.

82.     Plaintiff and the other protesters were stopped at the intersection of Broad Street and Exchange Blvd. by Defendants, who prohibited their freedom of movement at the intersection.

83.     On September 5, 2020, at approximately 10:20 p.m., the RPD Officers and Sheriff's Deputies kettled and trapped Ms. FLANNERY and hundreds of other protesters at the intersection of Broad Street and Exchange Blvd.

84.     Ms. FLANNERY was present near the front line at the northwest corner of Broad and Exchange when the RPD officers issued dispersal orders, knowing that it was physically impossible for Ms. FLANNERY and the other protesters to comply and leave the area.

85.     The RPD Officers and Sheriff's Deputies attacked Ms. FLANNERY and the other protesters with chemical weapons in retaliation for the message they were expressing—justice for Daniel Prude and an end to decades of racist policing practices.

86.     On September 5 at approximately 10:30 p.m. at the intersection of Broad Street and Exchange Blvd, while she was standing on the sidewalk in the vicinity of the Times Square building, a RPD Officer and/or Sheriff's Deputy launched a tear gas cannister at Ms. FLANNERY from close range, which struck her in her left leg.

87.     The cannister then fell to the ground and Ms. FLANNERY was engulfed by tear gas, causing her to vomit at that time, and throughout the night.

88.     At no time did Ms. FLANNERY commit any crime or violation.

89.     At no time did Ms. FLANNERY threaten police in any way.

90.     The RPD Officers lacked cause or any justification to or use any physical force against Ms. FLANNERY.

91.     Any no time did Defendants make an individualized determination that they had cause or legal justification to use force against Ms. FLANNERY; instead, the use of force was based on perceived "group conduct."

92.     As a result of the chemical weapons Defendants used against her on September 5-6, 2020, Ms. FLANNERY vomited numerous times, her body convulsed involuntarily, she sustained irritation to their skin, eyes, mouth, nose and lungs and suffered menstrual irregularities.

93.     Ms. FLANNERY also sustained pain, bruising and swelling from being shot with a tear gas cannister and emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

**Night of October 13, 2020**

94.     On the night of October 13, 2020, Ms. FLANNERY and several other individuals went to the atrium of the PSB to inquire about their friend, Nicholas Wilt, who had been falsely arrested and was being detained on a mistaken warrant.

95.     The atrium of the PSB is a public place.

96.     On the night of October 13, 2020, prior to Ms. FLANNERY's arrival, the atrium to the PSB was open to the public.

97.    At approximately 8:30 p.m., inside of the atrium of the PSB, while inquiring about Mr. Wilt, RPD officers demanded Ms. FLANNERY and the other individuals leave. Without providing time or opportunity for Ms. FLANNERY and others to comply and leave the building, RPD officers issued an order to "just push them".

98.    Ms. FLANNERY was pushed by one or more officers, pinned to a wall near the door, repeatedly pushed and shoved, thrown to the ground, and repeatedly struck by RPD Officers.

99.    At no time did Ms. FLANNERY commit any crime or violation.

100.    At no time did Ms. FLANNERY threaten police in any way.

101.    The RPD Officers lacked cause or any justification to push, strike, or use any physical force against Ms. FLANNERY.

102.    As a result of the physical force used against her, Ms. FLANNERY sustained pain about her head and body.

103.    Ms. FLANNERY also sustained emotional and psychological harm from being attacked by the RPD officers when she was peacefully trying to get information about her friend.

B. **The Unlawful Municipal Policies of the City and RPD, and County and BAXTER Caused Ms. FLANNERY'S First, Fourth and Fourteenth Amendment Rights to be Violated, and Caused her to Sustain Serious Injuries**.

104.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. The City and RPD coordinated with the County, BAXTER and MSCSO

105.    From the very beginning, policymaking officials of the City and RPD (including former Chief Singletary), and the County and MSCO (including BAXTER), zeroed in on the fact

that, unlike other protests, these were focused directly on police misconduct and racism; policymaking officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

106. This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

107. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

108. Prior to the protests that erupted on September 2, 2020, former RPD Chief La'Ron Singletary and Monroe County Sheriff TODD BAXTER, along with other final policymakers with respect to police practices for the City and County, designed and orchestrated the unlawful protest response plan.

109. RPD officers and MCSO deputies were ordered by Singletary, BAXTER and other final policymakers to suppress the protests. RPD officers and MCSO deputies were given

military-grade equipment and authority to spray and gas indiscriminately, aim high with pepper balls and KIPS, and inflict pain as a deterrent.

110.     Pursuant to policy, RPD officers and MCSO deputies were ordered to target journalists, legal observers, and others like Ms. FLANNERY who were filming and/or documenting their response to the protesters, in retaliation for them documenting and/or recording the law enforcement response to the protests.

111.     The multi-agency response to the September 2020 Black Lives Matter protests was managed under a Unified Command (UC) system between the CITY and the RPD; the COUNTY, MCSO and BAXTER.

112.     On the nights of protests, policymaking officials for the RPD and CITY, along with BAXTER and other policymaking officials of the MCSO and County, were present in the Command Posts and were overseeing and directing the response of the RPD officers and Sheriff's Deputies to the protesters—including the use of specific tactics and weapons.

113.     The natural, inevitable result of the City and County policies is exactly what transpired: officers complying with official policies on the use of the "less lethal" force caused serious injuries to journalists, legal observers and peaceful protestors. Therefore, there was a "direct causal link" between the offending policies and the constitutional deprivations Ms. FLANNERY suffered; in other words, Ms. FLANNERY's particular injuries were incurred *because* of the execution of the unlawful City and County policies.

114.     Over the Course of three nights, from September 2-6, 2020, RPD officers and Sheriff's Deputies implemented the unlawful protest response plan (PRP) and responded to peaceful protests with extreme violence:

- The City and County Defendants created a Unified Command (UC) to establish a common set of objectives, strategies, and a single "protest response plan" (PRP). The objective of

this coordinated protest response PRP was to create an intimidating, militarized, multi-agency response under a unified command system. Under the response plan, the City and County Defendants trained and instructed RPD officers and Sheriff's Deputies to use force against "groups" of protesters, without first having made an individualized determination that there was a lawful basis to use force against any individual in the group based on their own individual conduct, as opposed to the perceived "group conduct."

- RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists, and at legal observers and others attempting to report on and record the abuse, like Ms. FLANNERY, and at medics there to provide care and safety to the protesters—often after they blocked off all escape routes to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons capable of causing significant blunt trauma, including bone fractures, lacerations, internal bleeding, and death. One protester struck in the face by a canister required stitches inside and outside of her mouth and has permanent facial scarring.

- Over those three nights, RPD officers discharged 6,100 pepper balls at people protesting the Departments' aggressive and racist practices. RPD officers shot protesters with 40mm direct-impact foam bullets—kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended and unintended targets. RPD officers fired CTS 40 mm munitions during the protest. The CTS website cautions that shots to the head, neck, thorax, heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration. RPD officers also used flash bang grenades, deployed sonic weapons, and struck protesters with batons.

- RPD officers and Sheriff's Deputies fired the "less lethal" munitions indiscriminately into crowds of protesters, including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

- RPD Chief La'Ron Singletary, a policymaker for the CITY on police practices, designed and implemented the protest response plan on behalf of the CITY, and implemented the unlawful policies that required RPD officers to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists, legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

- Monroe County Sheriff TODD BAXTER, a policymaker for the COUNTY on police practices, designed and implemented the protest response plan on behalf of the COUNTY, and implemented the unlawful policies that required Sheriff's Deputies to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists,

legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

115.    Moreover, City officials effectively ratified the RPD's violent response. While hundreds of peaceful protesters, many of them Black and brown, were injured by RPD's violent response to the demonstrations, the Department condoned its officers' actions. Former RPD Chief Singletary praised RPD officers, saying publicly that they "showed restraint" when many peaceful demonstrators, including elected officials, were shot in the head with pepper balls, pepper sprayed, and worse. RPD Deputy Chief Mark Mura declared that the tactics RPD officers used were "tactful, *per policy and training*, and appropriate for the situation at hand." Former Mayor Lovely Warren also praised RPD officers: "[Y]ou made us very, very proud."

116.    The widespread use of pepper spray, pepper-balls, tear gas, and other types of "less lethal" weapons belies any claim that individual officers were acting on their own rather than implementing a preconceived municipal plan.

**i.    Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters.**

117.    The violations of Ms. FLANNERY'S rights are attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar peaceful protests and peaceful demonstrations.

118.    The violations of Ms. FLANNERY'S rights are attributable to the CITY and RPD's failure to appropriately train its officers in the proper handling of First Amendment assemblies despite notice that such training was necessary to prevent constitutional violations.

119.    Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests, lawful demonstrations, and the rights of the press, legal observers and others to document law enforcement performing their duties in public.

120.    Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

121.    According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

122.    The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 4-5, 2020 specifically.

123.    Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

124.    Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Ms. FLANNERY.

125.    Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

126.    However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

127.    For example, upon information and belief, there is virtually no RPD training— and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

128.    Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

129.    Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students

to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined

130.    Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

131.    In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

132.    When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

133.    The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.  However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

134.    The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on use for force. There appears to have been no consideration given to whether such force would be excessive to secure compliance with traffic laws or enforce violations or misdemeanors against nonviolent protestors.

135.    In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of

protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated.

136.    As a result of the City's negligence and its unlawful polices with respect to respading to the protests, Plaintiff was injured and harmed, as described herein.

ii.    **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

137.    Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

138.    The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

139.    The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

140.    Instead, the COUNTY and BAXTER, pursuant to the County's Hazard Mitigation Plan, trained Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

141.    Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

142.    Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

143.    Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

144.    According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of the COUNTY and BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

145.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

146.     Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

147.     Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

148.     Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

149.     Like the RPD, none of the training provided by BAXTER, the COUNTY or MCSO contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

150.     In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

151.     BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

152.     As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

### IV.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Municipal Liability

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights***
**(Against the City)**

153.     All preceding and subsequent paragraphs are incorporated by reference.

154.     All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

155.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## SECOND CLAIM FOR RELIEF
### Municipal Liability
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights*
### (Against the COUNTY and BAXTER)

156.    All preceding and subsequent paragraphs are incorporated by reference.

157.    As detailed above, all of the wrongful acts or omissions complained of herein against Plaintiff and other journalist, legal observers and protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

158.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## THIRD CLAIM FOR RELIEF:
### Municipal Liability
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights—Related to the RPD's Policy, Practice and Custom of Retaliating Against Individuals Who Are Lawfully Recording Them Perform Their Duties in Public Places*
### (Against the City)

159.    All preceding and subsequent paragraphs are incorporated by reference

160.    All of the wrongful acts or omissions complained of herein against Ms.

FLANNERY were carried out by the individually named and unnamed RPD officers pursuant to:

(a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by

Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so

widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned,

ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's

deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth

Amendments of the United States Constitution, as evidenced by the CITY's failures, and the

failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite

full knowledge of the their wrongful acts against Plaintiff, as described herein.

161.    The City and RPD maintain an unlawful policy, practice and/or custom of RPD

officers retaliating against individuals who are lawfully video recording them perform their

duties in a public place.

162.    The unlawful policy of retaliating against individuals who are lawfully video

recording the RPD performing their duties in a public place can be inferred from the following

incidents:

a.   Emily Good was a victim of one such "contempt of cop" arrest on May 12,

2011. Ms. Good was standing on the front lawn of her home filming—from

10 to 15 feet away—RPD officers engaged in the traffic stop of a young Black

man. RPD Officer Mario Masic noticed Ms. Good filming and ordered her

back into her home, stating she seemed "anti-police" and he did not feel safe

with her there. Ms. Good remained calm and stated she was only standing on

her property and did not pose any threat. Masic responded that he'd had enough: "You know what? You're going to go to jail." He then trespassed onto Ms. Good's property, unlawfully seized and handcuffed her, and forcibly led her to a squad car while she pleaded for him to explain why she was being arrested. A video of the unlawful arrest, incorporated by reference herein, can be found here: https://tinyurl.com/yff34jaw. Ms. Good was charged with "obstructing governmental administration" but the charges were later dropped. Though RPD's internal view concluded Masic should not have arrested Ms. Good for recording the traffic stop, then-Police Chief James Sheppard praised Masic for maintaining his "professional demeanor" in effecting the illegal arrest.

b. On December 16, 2015, RPD Officer William Baker assaulted, battered and falsely arrested Shelise Colon in retaliation for her video recording Baker and RPD Officer Jason Kelly after they had stopped her boyfriend, Lawrence Barrett, on the sidewalk for no reason and pointed a TASER at him. The City settled the civil lawsuit brought by Colon and Barrett for $35,000.

c. In July 2016, RPD officers targeted and arrested two black journalists at a Black Lives Matter protest in downtown Rochester. Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained by police, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Press colleagues who were there described RPD ignoring white reporters standing right next to Ms. Cleare and Mr. Carter and instead targeting the two Black journalists.

d.   On May 27, 2018, at approximately 1:30 a.m., RPD Officer Michael Stephens assaulted, battered and falsely arrested Anthony Hall and Shamell Killings when they were lawfully recording him assault and batter their friend Craig Puritt on a public sidewalk on Monroe Avenue in the vicinity of Meigs Street. The City settled the civil lawsuit brought by Hall, Killings and Puritt for $175,000.

e.   On December 18, 2019, RPD Officers Dakota Vanbrederode and Ethan Paszko assaulted, battered and falsely arrested Dynasty Buggs in retaliation for her attempting to film them during a traffic stop. After Ms. Buggs pulled over, Vanbrederode approached the driver's side and ordered Ms. Buggs to exit the car without lawful justification. When Buggs objected and tried to record what was happening on her phone, Vanbrederode grabbed her phone and threw it. He then pepper sprayed her in the face while she was still in the car. After, Vanbrederode forcibly removed Ms. Buggs from the car, placed handcuffs on her wrists, and pepper sprayed her again after she was handcuffed. Vanbrederode falsely charged Ms. Buggs with obstruction of governmental administration; all charges were dropped at her first court appearance.

f.   In June 2020, Tobias Massey was falsely arrested, assaulted and battered in retaliation for recording RPD officers violently arresting a man in his front yard. Mr. Massey was woken up at night  by the sound of screaming from his front yard, where three RPD officers were on top of a Black man, who was crying that he could not breathe and did not want to die. Mr. Massey went

outside to record the event. When the RPD officers noticed he was recording, they chased him into his home, wrestled him down, handcuffed and arrested him. Mr. Massey was taken to the emergency room because of injuries he sustained from the encounter, where the officers gave him an appearance ticket charging him with resisting arrest and obstructing governmental administration for filming the police. After reviewing the video, former Chief Singletary dropped the charges against Mr. Massey.

g.  Emily McIntyre was falsely arrested by RPD officer Stephen Boily and other RPD officers on August 2, 2020 at approximately 12:00 a.m. in the vicinity of East Avenue and Alexander Street in retaliation for filming an RPD officer who was arresting a Black man in front of a bar called Murphy's Law. The officers falsely charged her with a violation of the Mayor's unlawful curfew, even though she was not congregated with any other person, let alone five or more people as required to be arrested under the "curfew." All the false charges were dismissed in their entirety on January 19, 2021.

h.  At protests in the City of Rochester following the release of the video of RPD officers killing Daniel Prude, photojournalist Reynaldo DeGuzman was repeatedly targeted and shot with pepper balls and other chemical weapons in retaliation for video recording officers performing their duties in public. On September 3, 2020, RPD officers shot DeGuzman in the neck in retaliation for him filming RPD officers violently arrest another protester named Jamia McCuller. Thereafter, on September 4, 2020, while videorecording RPD officers respond to peaceful protesters on the Court Street Bridge, RPD

officers repeatedly targeted him and shot his camera equipment, disabling his camera equipment and preventing him from filming and documenting the law enforcement response to the protests for the remainder of the night.

i. At protests in the City of Rochester following the release of the video of RPD officers killing Daniel Prude, photojournalist Maranie Rae Staab was repeatedly targeted and shot with pepper balls and other chemical weapons in retaliation for video recording officers performing their duties in public. On September 4, 2020, while videorecording RPD officers respond to peaceful protesters on the Court Street Bridge, RPD officers repeatedly targeted her and shot her with pepper balls and other projectiles; later that night, she was targeted and shot while standing alone on the sidewalk filming officers respond to the protesters; on September 5, 2020, Ms. Staab was repeatedly attacked by Defendants in retaliation for filing them—for example, In the following video, Ms. Stabb documents RPD officers and/or Sheriff's Deputies attack several protesters with as they attempted to help an injured person to their feet—first, the officers shoot pepper balls, spray chemical weapons, and throw a tear gas cannister at them from behind the barricades; then they rush through the barricades and kick and shove the protesters; then when the officers realize Ms. Staab is recording them, then turn towards her and spray her with chemical weapons in retaliation for filming them:

https://www.instagram.com/p/CEzSnUTD_1h/.[1]

---

[1] This video is expressly incorporated by reference herein; however, none of the other pictures or videos on Ms. Staab's social media or website are incorporated herein.

j.  Another woman named Devorah Chatman was also shot numerous times with pepper balls by RPD officers on September 3, 2020 in retaliation for attempting to video record RPD officers violently arrest Jamia McCuller.

k.  On September 3, 2020, RPD officers targeted and shot *Democrat & Chronicle* photographer Tina MacIntyre-Yee in the head as she was video recording officers respond to protesters in the vicinity of the Public Safety Building. The video of that incident, incorporated herein, is available at https://tinyurl.com/2hy52d5d.

l.  On December 18, 2020, Assemblyman Demond Meeks was falsely arrested in retaliation for filming RPD officers who were preparing to effectuate an eviction of a mother and her three children in the middle of the pandemic at 87 Glasgow Street, Rochester, New York, which is within the 137th Assembly District for which Assemblyman Meeks serves. Assemblyman Meeks was not interfering with the RPD officers in any way, physical or otherwise, but was seized, arrested, and falsely charged with violations of PL § 190.05. All the false charges were eventually dismissed on February 11, 2021.

m.  On December 18, 2020, Indiia Maring was also falsely arrested in retaliation for filming RPD officers who were preparing to effectuate an eviction of a mother and her three children in the middle of the pandemic at  87 Glasgow Street, Rochester, New York. Like Assemblyman Meeks, Mx. MARING was standing alone on the sidewalk and not interfering with the RPD officers in any way, physical or otherwise, but was seized, arrested, and falsely charged

with violations of PL § 190.05. Like Assemblyman Meeks, all the false

charges were eventually dismissed on February 11, 2021.

163.    Additionally, upon information and belief, there are numerous other incidents and

lawsuits that are not listed here, but of which the City and RPD know about and are aware,

during which RPD officers unlawfully retaliated against people for lawfully filming them

perform their official duties in public.

164.    Thus, for many years, the City and RPD has had actual notice of the widespread

unlawful practice of RPD officers retaliating against journalists, legal observers, and other

individuals because they were lawfully recording officers performing their duties in public

places, but they have done nothing to curtail this unlawful practice.

165.    Upon information and belief, to date the Defendant CITY has not implemented

any particular or remedial training, oversight measures or policies designed or intended to curtail

the longstanding and widespread practice of RPD officers of retaliating against individuals for

lawfully recording them perform their official duties in public places.

166.    The RPD's practice of tolerating and condoning its officers retaliate against

individuals for lawfully video recording them performing their duties in public caused the

ROMANO to shoot Ms. FLANNERY in the head from close range on September 4, 2020 at

approximately 12:50 a.m.

167.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## FOURTH CLAIM FOR RELIEF:
### *Violation of New York Right to Monitor Act*
### *New York Civil Rights Law § 79-p*

168.    All preceding and subsequent paragraphs are incorporated by reference

169. On September 4, 2020 at approximately 12:50 a.m., ROMANO and/or another RPD officer and/or Sheriff's Deputy shot Ms. FLANNERY in the head with a pepper ball from close range in retaliation for her filming law enforcement activity in a public place.

170. Prior to being assaulted, battered and shot in the head with a pepper ball on September 4, 2020 at approximately 12:50 a.m., Ms. FLANNERY was exercising her rights under New York Civil Rights Law § 79-p, the New Yorker's Right to Monitor Act, to record law enforcement activity and to maintain custody and control over the recordings he had taken.

171. Prior to being assaulted, battered and shot in the head with a pepper ball, Ms. FLANNERY had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

172. ROMANO and/or another RPD officer and/or Sheriff's Deputy shot Ms. FLANNERY in the head with a pepper ball, intentionally preventing her from further recording law enforcement activity.

173. The RPD officers and Sheriff's Deputies lacked reasonable or probable cause to stop, seize or arrest Ms. FLANNERY for obstruction of governmental administration or any other crime.

174. ROMANO and/or the other RPD officer and/or Sheriff's Deputy who shot Ms. FLANNERY in the head was at all times agents, servants, and employees acting under color of law and within the scope of their employment by the Defendant CITY and the RPD, the COUNTY and BAXTER, which are therefore responsible for their conduct.

175. The Defendant CITY, as the employer of the individual RPD Officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

176.    Defendant RPD officers and Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

177.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## FIFTH CLAIM FOR RELIEF

### Excessive Force

### *Pursuant to 42 U.S.C. § 1983*

178.    All preceding and subsequent paragraphs are incorporated by reference.

179.    Defendants' actions towards Plaintiff constitute excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

180.    Defendants used force against Ms. FLANNERY that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

181.    It was objectively unreasonable for ROMANO and/or another RPD officer and/or Sheriff's Deputy to shot Ms. FLANNERY in the head with a pepper ball from close range. This conduct constitutes a seizure under the 4th Amendment.

182.    It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to use military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. FLANNERY on September 2-6, 2020, without first having made an individualized determination that it was reasonable to use any force Ms. FLANNERY based on her own individual conduct, instead of any perceived "group conduct." This conduct constitutes a seizure under the 4th Amendment.

183.    It was objectively unreasonable for the RPD Officers to seize, push and strike Ms. FLANNERY on October 13, 2020. This conduct constitutes a seizure under the 4th Amendment.

184.   The types and levels of force Defendants used against Ms. FLANNERY were in contravention of, or inconsistent with, related policies and/or training.

185.   As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Ms. FLANNERY of her federal, state, and/or other legal rights; caused Ms. FLANNERY bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Ms. FLANNERY to expend costs and expenses; and/or otherwise damaged and injured Ms. FLANNERY.

186.   The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

187.   As a result, Ms. FLANNERY sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## SIXTH CLAIM FOR RELIEF

### Assault and Battery

#### *Pursuant to New York State Law*

188.   All preceding and subsequent paragraphs are incorporated by reference.

189.   RPD officers and/or Sheriff's Deputies battered Ms. FLANNERY by subjecting her to various military grade weapons; "less-than-lethal" weapons and chemical weapons on September 2-6, 2020—including shooting her numerous times with pepper balls.

190.   JOHN DOE RPD OFFICER WHO SHOT MS. FLANNERY IN THE HEAD battered Ms. FLANNERY on September 4, 2020 when he shot her in the head with a pepper ball from close range, without cause or legal justification.

191.   RPD officers battered Ms. FLANNERY on October 13, 2020 by repeatedly shoving, pushing and striking her, without cause or legal justification.

192.    The types and levels of force Defendants used against Ms. FLANNERY were in contravention of, or inconsistent with, related policies and/or training.

193.    Ms. FLANNERY was not threatening the law enforcement officers or any other person at any time.

194.    By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Ms. FLANNERY, when they, in a hostile and/or offensive manner struck Plaintiff without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

195.    The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

196.    The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

197.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

198.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

199.    As a result, Ms. FLANNERY sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## **SEVENTH CLAIM FOR RELIEF**

### **First Amendment Infringements, Including First Amendment Retaliation**

### ***Pursuant to 42 U.S.C. § 1983***

200.     All preceding and subsequent paragraphs are incorporated by reference.

201.     In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

202.     Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting Plaintiff to excessive force, selectively enforcing laws and regulations against Plaintiff, and otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

203.     Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's perceived protected speech and/or conduct.

204.     Defendants engaged in those and other acts and omissions complained of herein in retaliation for the message Plaintiff and other protesters were expressing: justice for Daniel Prude, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

205.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

206.     ROMANO and/or other defendants shot Ms. FLANNERY in the head from close range with a pepper ball on September 4, 2020 in retaliation for her exercising her First Amendment Right to record law enforcement performing their duties in a public place.

207.     Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

208.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

209.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## EIGHTH CLAIM FOR RELIEF

### Failure To Intervene

### *Pursuant to 42 U.S.C. § 1983*

210.    All preceding and subsequent paragraphs are incorporated by reference.

211.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant RPD officers and/or Sheriff's Deputies.

212.    The individual Defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

213.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

214.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

215.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

216.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## NINTH CLAIM FOR RELIEF

### Negligent Training, Supervision and Discipline

### (Against BAXTER)

217.   All preceding and subsequent paragraphs are incorporated by reference.

218.   Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

219.   Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

220.   Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

221.   BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

222.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## TENTH CLAIM FOR RELIEF
### Negligent Planning of the Protest Response
### (Against BAXTER)

223.   All preceding and subsequent paragraphs are incorporated by reference.

224.   As detailed above, Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

225.    BAXTER had a special duty to ensure that the rights of Plaintiff and other journalist, legal observers and protesters rights to free speech, expression, assembly, petition for

the redress of grievances, to the press, and to record officers performing their duties in public under the First Amendment to the United States Constitution, Article I, section 8 of the New York State Constitution, and New York Civil Rights Law § 79-p, the New Yorker's Right to Monitor Act, were not violated, and journalist, legal observers and protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement; and to ensure that journalists, legal observers and others were not retaliated against for documenting and recording the law enforcement response to the protests in public places.

226.    BAXTER breached his duty to keep Plaintiff and other journalist, legal observers and protesters safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all journalist, legal observers and protesters by collectively punishing the nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor; and Plaintiff and other journalist and legal observers did not have the right to document and record their response to the protests.

227.    BAXTER breached his duty to Plaintiff and other journalist, legal observers and protesters by implementing a protest response plan that violated the rights to free speech, expression, assembly, petition for the redress of grievances, to the press, and to record officers performing their duties in public.

228.    BAXTER breached his duty to Plaintiff and other journalist, legal observers and protesters by implementing a protest response plan that conflated peaceful protests and

demonstrations with violent mobs and riots; thus, BAXTER knew or should have known that in the absence of a proper protest response plan, his Sheriff's Deputies would use unreasonable and excessive force against peaceful journalists, like Plaintiff.

229.    BAXTER breached his duty to Plaintiff and other journalist, legal observers and protesters by implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities. BAXTER also had actual or constructive knowledge that the chemical weapons cause harm to the female reproductive system, because the warnings on the Defense Technology website and on the chemical weapons themselves state that they cause harm to the female reproductive system.

230.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs and/or riots.

231.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

232.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

233.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-

lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

234.   Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

235.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## ELEVENTH CLAIM FOR RELIEF
### Negligent Training, Supervision and Discipline
### (Against the CITY)

236.   All preceding and subsequent paragraphs are incorporated by reference.

237.   The CITY and RPD were negligent in the training, supervision and discipline of the RPD officers, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

238.   Alternatively, the training the CITY provided to the RPD officers was inadequate.

239.   Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, the CITY was negligent in failing to supervise or discipline any of the RPD officers related to any force used protesters on those nights prior to Plaintiff's injury. The City's negligence was the direct and proximate cause of Plaintiff's injuries.

240.   As a result of the foregoing, Plaintiff suffered injuries and damages.

## TWELFTH CLAIM FOR RELIEF
### Negligent Planning of the Protest Response
### (Against the CITY)

241.   All preceding and subsequent paragraphs are incorporated by reference.

242.   All preceding and subsequent paragraphs are incorporated by reference.

243. The CITY and RPD were negligent in planning the response to the protests.

244. The CITY had a special duty to ensure that the rights of Plaintiff and other journalist, legal observers and protesters rights to free speech, expression, assembly, petition for the redress of grievances, to the press, and to record officers performing their duties in public under the First Amendment to the United States Constitution, Article I, section 8 of the New York State Constitution, and New York Civil Rights Law § 79-p, the New Yorker's Right to Monitor Act, were not violated, and journalist, legal observers and protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement; and to ensure that journalists, legal observers and others were not retaliated against for documenting and recording the law enforcement response to the protests in public places.

245. For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

246. The CITY and RPD breached its duty to keep Plaintiff and other journalist, legal observers and protesters safe by, among other things, implementing a protest response plan that instructed officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of RPD officers that what seem to be

peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all journalist, legal observers and protesters by collectively punishing the nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor; and Plaintiff and other journalist and legal observers did not have the right to document and record their response to the protests.

247.     The CITY and RPD breached its duty to Plaintiff and other journalist, legal observers and protesters by implementing a protest response plan that affirmatively violated protesters' rights to rights to free speech, expression, assembly, petition for the redress of grievances, to the press, and to record officers performing their duties in public and the New York Right to Monitor Act.

248.     The CITY and RPD breached its duty to Plaintiff and other journalist, legal observers and protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

249.     The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause the rights of Plaintiff and other journalist, legal observers and protesters to free speech, expression and to assemble under the First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

250.     The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators, and targeted journalists and other members of the

press; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators, falsely arrest them; and would target journalists and other members of the press and use force against them in retaliation for them recording and documenting officers' response to the protests in public places.

251.    The City breached his duty to Plaintiff and other journalist, legal observers and protesters by implementing a protest response plan that instructed his RPD officers to use chemical weapons against protesters; however, based on national news reports in the months before the September protests, the City had actual and/or constructive knowledge that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities. The City had actual or constructive knowledge that the chemical weapons cause harm to the female reproductive system, because the warnings on the Defense Technology website and on the chemical weapons themselves state that they cause harm to the female reproductive system.

252.    The CITY breached his duty to keep Plaintiff and other journalist, legal observers and protesters safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

253.    The CITY breached its duty to keep Plaintiff and other journalist, legal observers and protesters safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

254.    The CITY breached its duty to keep Plaintiff and other journalist, legal observers and protesters safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

255.    The CITY breached his duty to keep Plaintiff and other journalist, legal observers and protesters safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

256.    The CITY breached his duty to keep Plaintiff and other journalist, legal observers and protesters safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

257.    Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

258.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## THIRTEENTH CLAIM FOR RELIEF

### Negligence

### (Against the Individual Defendants)

259.    All preceding and subsequent paragraphs are incorporated by reference.

260.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries.

261.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

262.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

263.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

264.    The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Ms. FLANNERY's serious injuries described herein.

265.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

266.    As a result, Ms. FLANNERY sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

**WHEREFORE** and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.    Empanel a jury;

b.    Award compensatory and punitive damages;

c.    The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts,

except that the punitive damages demands are, as a matter of law, not

recoverable against a municipality and therefore are not made against the City;

d.      Statutory attorney's fees, disbursements and costs of the action pursuant to,

*inter alia*, 42 U.S.C. § 1988, New York Civil Rights Law § 79-P(3)(d), and

New York common law; and

e.      Such other and further relief as the court may deem just and proper.

Dated: New York, New York          Respectfully Submitted,
        February 2, 2022

                                        ROTH & ROTH, LLP.
                                        EASTON THOMPSON KASPEREK SHIFFRIN LLP

                                        ~//s//~

                                        _____
                                        Elliot Dolby Shields
                                        Co-counsel for Plaintiffs
                                        192 Lexington Avenue, Suite 802
                                        New York, New York 10024
                                        (212) 425-1020

                                        Donald Thompson
                                        Co-counsel for Plaintiffs
                                        16 West Main Street, Suite 243
                                        Rochester, New York 14614
                                        Ph: (585) 423-8290

## ATTORNEY'S VERIFICATION

**ELLIOT DOLBY SHIELDS,** an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalties of perjury:

I am associated with Roth & Roth, LLP, attorneys for the Plaintiff, I have read the annexed **VERIFIED AMENDED COMPLAINT** and know the contents thereof, based on the files maintained in my office, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files. This verification is made by me and not my client because she resides in a different county from where I maintain my office.


DATED: New York, New York
        February 2, 2022



~//s//~

_____

ELLIOT DOLBY SHIELDS