UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

AMANDA FLANNERY,

                                  Plaintiff,

                                                            Case # 22-CV-6101-FPG

v.

                                                            DECISION AND ORDER

THE CITY OF ROCHESTER, et al.,

                                  Defendants.

## INTRODUCTION

This is one of many cases pending before the Court that arises out of protests that erupted in the City of Rochester in September 2020 following the release of news that Daniel Prude, an unarmed black man, died during an encounter with police in March 2020. Plaintiff Amanda Flannery—a Rochester resident who alleges she was injured during the protests—filed this action in state court against the City of Rochester ("City"), Rochester Police Department ("RPD") John Doe Police Officers 1-200, RPD Officer Paul Romano, the County of Monroe (the "County"), Monroe County Sheriff Todd Baxter ("Baxter"), and Richard Roe Sheriff's Deputies 1-200,[1] for multiple federal and state claims. Plaintiff filed an Amended Complaint, and the County Defendants removed the case, ECF No. 1.

In the Amended Complaint, Plaintiff raises 13 claims: (1) municipal/*Monell* liability against the City for alleged violations of the First, Fourth, and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983; (2) municipal/*Monell* liability against the County and Baxter for alleged violations of the First, Fourth, and Fourteenth Amendments, pursuant to § 1983; (3)

---

[1] John Doe police officers and Paul Romano ("the RPD Officers") and the City are collectively referred to as "City Defendants." The County, Baxter, and Richard Roe Sheriff's deputies are collectively referred to as "County Defendants." The RPD Officers and Sheriff's deputies are collectively referred to as "Individual Officers." All defendants are collectively referred to as "Defendants."

municipal/*Monell* liability against the City for alleged violations against individuals who are lawfully recording, pursuant to § 1983; (4) violation of New York Right to Monitor Act, New York Civil Rights Law § 79-p, against the City; (5) excessive force against all Defendants, pursuant to § 1983; (6) assault and battery against all Defendants, pursuant to New York State law; (7) First Amendment infringement and retaliation against all Defendants, pursuant to § 1983; (8) failure to intervene against all Defendants, pursuant to § 1983; (9) negligent training, supervision, and discipline against Baxter, pursuant to New York State law; (10) negligent planning of the protest response against Baxter, pursuant to New York State law; (11) negligent training, supervision, and discipline against Baxter, pursuant to New York State law; (12) negligent planning of the protest response against the City, pursuant to New York State law; and (13) negligence against the Individual Officers, pursuant to New York State law.

On March 3, 2022, the City Defendants filed a motion to dismiss some of the claims asserted against them.  ECF No. 6.  On April 30, 2022, the County Defendants filed a motion to dismiss all of the claims asserted against them.  ECF No. 12.  The motions are now fully briefed. For the reasons set forth below, the parties' motions to dismiss are GRANTED IN PART and DENIED IN PART.

## FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Amended Complaint and they are accepted as true for purposes of deciding the motion to dismiss.

Plaintiff participated in large public demonstrations in September 2020.  When Plaintiff arrived at the protest on the night of September 2-3, 2020, Defendants had already closed Exchange Boulevard in front of the Public Safety Building ("PSB") to vehicular traffic.  ECF No. 1-1[2] ¶ 30.

---

[2] Citations to ECF No. 1-1 are to the Amended Complaint contained within the notice of removal at pages 90 to 141.

At around 5:00 p.m., Individual Officers shot Plaintiff with pepper balls and sprayed her with chemical weapons; one law enforcement officer sprayed Plaintiff directly in the face without cause or justification, simply based on their objection to the message the protestors were expressing. *Id.* ¶¶ 31-32, 36.  As a result, Plaintiff sustained irritation to her skin, eyes, mouth, nose, and lungs, menstrual irregularities, pain, bruising, and swelling, and emotional and psychological harm. *Id.* ¶¶ 37-38.

Plaintiff again participated in protests on the night of September 3-4, 2020.  That night, Defendants erected barricades and closed Exchange Boulevard near the PSB. *Id.* ¶ 41.  Again, Individual Officers shot Plaintiff with pepper balls in the torso and legs. *Id.* ¶ 43.  She was subjected to "a large amount of chemicals from pepper spray and/or tear gas" by Individual Defendants, without any legal justification. *Id.* ¶¶ 44-47.  Thereafter, Individual Defendants "pushed and shoved [Plaintiff] and others with their hands and batons." *Id.* ¶¶ 51-52.  At some point after midnight, Individual Officers—including Romano—shot Plaintiff in the head with a pepper ball "from approximately 10 feet away" while she attempted to film the officers as the protestors complied with orders to "move back." *Id.* ¶ 53.  Plaintiff alleges that she was shot in retaliation expressing her viewpoint and for filming them. *Id.* ¶¶ 56-57.  As a result, Plaintiff sustained irritation, pain, psychological harm, and a concussion. *Id.* ¶¶ 58-60.

Plaintiff returned to the protests on the night of September 4-5, 2020.  That night, Individual Officers escorted peaceful protestors onto the Court Street Bridge. *Id.* ¶ 62.  However, when the protestors reached the other side of the bridge, law enforcement stopped the protestors with metal barricades, trapping them on the bridge. *Id.*  At some point around 11:00 p.m., law enforcement ordered the protestors to disperse. *Id.* ¶ 66.  But because the protestors were trapped on the bridge, there was nowhere to go. *Id.*  Within seconds of the dispersal order, Individual Officers began

firing pepper balls, pepper spray, and tear gas at the protestors, including Plaintiff.  *Id.* ¶¶ 66-67.  Plaintiff was hit in the legs and body with pepper balls and subjected to large amounts of tear gas.  *Id.* ¶¶ 68-69.

Plaintiff returned to protest on the night of September 5-6, 2020.  That night, Individual Officers trapped Plaintiff and other peaceful protestors at the intersection of Broad Street and Exchange Boulevard and indiscriminately attacked them with "military grade weapons" such as flash bang grenades, tear gas, and pepper balls.  *Id.* ¶¶ 83-85.  At around 10:30, while she was standing at near the Times Square Building, an Individual Officer "launched a tear gas canister" at Plaintiff "from close range, which struck her left leg."  *Id.* ¶ 86.  Plaintiff was engulfed in tear gas, "causing her to vomit at that time, and throughout the night."  *Id.* ¶ 87.

Over a month later, on October 13, 2020, Plaintiff and several other individuals went to the PSB to inquire about their friend, Nicholas Wilt, who had been falsely arrested and was being detained on a mistaken warrant.  *Id.* ¶ 94.  While Plaintiff was attempting to ask for information, RPD Officers demanded that Plaintiff leave.  *Id.* ¶ 97.  Without providing enough time to comply with the order, RDP Officers pushed and shoved Plaintiff, pinning her to the wall, and then throwing her to the ground.  *Id.* ¶ 98.  As a result, Plaintiff sustained "pain about her head and body."  *Id.* ¶ 102.

Plaintiff alleges, *inter alia*, that Defendants failed to intervene on Plaintiff's behalf, that the police response to the protests and protestors was part of an unconstitutional municipal practice, that Defendants failed to properly train officers in proper protest responses, and that Defendants acted negligently in planning for and responding to the protests.

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim for relief is plausible when the plaintiff pleads facts sufficient to allow the Court to draw reasonable inferences that the defendant is liable for the alleged misconduct. *Id.* In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). At the same time, the Court is not required to credit "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . [with] a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (internal citations and quotations omitted). The "touchstone for a well-pleaded complaint under Federal Rules of Civil Procedures 8(a) and 12(b)(6) is plausibility." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 670 (S.D.N.Y. 2007) (citing *Twombly*, 550 U.S. at 560-61). To meet this plausibility standard, the factual allegations must permit the Court "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

**DISCUSSION**

I.    **First, Second, and Third Claims: Municipal Liability Pursuant to *Monell***

In her First and Second Claims, Plaintiff seeks to hold the City, the County, and Baxter liable for First and Fourth Amendment violations under *Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 693 (1978). In essence, Plaintiff asserts that the individual officers who caused her injuries were acting in accordance with the City and the County's unconstitutional customs or policies relating to the use of force during peaceful protests. Defendants, for their part, argue that Plaintiff has not

adequately pled such a custom or policy.  In her Third Claim, Plaintiff alleges that the City has an unconstitutional policy, custom, or practice of retaliating against individuals, like Plaintiff, who lawfully record the RPD performing their duties in a public place.  For the reasons explained below, the Court disagrees and permits the *Monell* claim to proceed.

### A.      Legal Standard

"[A] local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian v. Monroe Cnty., Alabama*, 520 U.S. 781, 784 (1997); *see Monell*, 436 U.S. at 693.  A plaintiff who seeks to impose liability on local governments pursuant to 42 U.S.C. § 1983 must demonstrate that "action pursuant to official municipal policy" caused the injury.  *Monell*, 436 U.S. at 692.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Monell*, 436 U.S. at 691) (additional citations omitted).  A plaintiff may demonstrate a policy or custom exists by showing:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester Cnty.*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, . . . a complaint does not suffice if it tenders naked assertions devoid of further factual enhancement."  *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301-02

(S.D.N.Y. 2015) (internal quotation marks and brackets omitted).  "To survive a motion to dismiss a municipal liability claim, a plaintiff must allege facts tending to support, at least circumstantially, an inference that a municipal policy or custom exists."  *McLennon v. City of New York*, 171 F. Supp. 3d 69, 95 (S.D.N.Y. 2016) (internal quotation marks and ellipsis omitted); *see also Cruz v. Vill. of Spring Valley*, No. 21-CV-2073, 2022 WL 428247, at *6 (S.D.N.Y. Feb. 11, 2022) (collecting cases).  Put simply, to allege "there is a policy does not make it so."  *Vassallo v. City of New York*, No. 15-CV-7125, 2016 WL 6902478, at *14 (S.D.N.Y. Nov. 22, 2016) (internal quotation marks omitted); *see also Cruz*, 2022 WL 428247, at *6 ("Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." (internal quotation marks omitted)).

### B.     First Claim – Municipal Liability for Protests – City

Plaintiff has adequately pled a *Monell* claim against the City.  At the outset, the City's argument that Plaintiff has not pled any underlying First or Fourth Amendment constitutional violations is without merit.  The City is correct that *Monell* does not provide a separate cause of action absent an underlying constitutional violation.  *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." (emphasis in original)).  But, as explained more fully below, Plaintiff has pled adequate First and Fourth Amendment violations: that the City's response to the protests was based on its objection to the message the protestors were expressing, and that the

City's actions or inactions led to excessive force being used against protestors.[3]  ECF No. 1-1 ¶¶ 117-36.

The City's arguments regarding Plaintiff's theories of *Monell* liability do not fare better.  The City argues that Plaintiff's statement that the City "approved the force during the demonstrations because its policies authorized excessive levels of force," ECF No. 1-1 ¶ 134, is conclusory.  But the City's argument is itself conclusory and ignores additional facts bolstering that allegation in the Amended Complaint.  For instance, Plaintiff alleges that the City knew that large-scale protests focused on police misconduct and racism would result from the eventual release of the body-worn camera footage, *id.* ¶ 104, the City believed that the protests would be led by outside influencers who would use peaceful protestors to shield themselves from police action, *id.* ¶ 105, and therefore, the City developed a protest response plan that targeted peaceful protestors based on an objection to their message and employed "extreme violence" through the use of military-grade and chemical weapons, *id.* ¶ 107, to quash the protests.  These factual allegations, assumed to be true at this juncture, are not conclusory.

Nor are Plaintiff's allegations surrounding the City's custom of using excessive force against protestors or its failure to train officers to appropriately respond to such protests.  Plaintiff alleges that the City's response to at least three previous protests, in which the police used excessive force against peaceful protestors, establishes that the City had a custom of utilizing such force and that the City knew of its training deficiencies but failed to change them.  *Id.* ¶¶ 129-30.  Plaintiff also alleged that the City's Mobile Field Force ("MFF")—which was "specially

---

[3] The City's contention that Plaintiff has failed to adequately plead an underlying Fourteenth Amendment violation is without merit.  The Court does not read Plaintiff's Amended Complaint to raise an independent claim arising under the Fourteenth Amendment.  Rather, Plaintiff cites the Fourteenth Amendment in accordance with the well-established rule that the Fourteenth Amendment is the vehicle through which the First and Fourth Amendments apply against the states.  *See Cantwell v. Connecticut*, 310 U.S. 296 (1940) (incorporating the First Amendment against the states); *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528(1967) (incorporating the Fourth Amendment against the states).

trained and equipped" to provide "rapid, organized and disciplined response to civil disorder [and] crowd control," *id.* ¶ 121—was highly militarized and filled with police officers who had histories of using excessive force, *id.* ¶ 128, and was not actually or adequately trained to appropriately respond to protests, only "large-scale civil disorders such as riots," *id.* ¶¶ 125-27. These failures, in turn, led to the disproportionate use of force against peaceful protestors. Again, these allegations are far from the sort of conclusory statements that require dismissal. Therefore, the City's motion to dismiss the first claim for *Monell* liability is denied.

### C.    Second Claim – Municipal Liability for Protests – County and Baxter

The allegations against the County and Baxter largely mirror those Plaintiff asserted against the City. Plaintiff alleges that the County and Baxter's responses to the protests were based on their objection to the message the protestors were expressing, and that the County and Baxter's actions or inactions led to excessive force being used against protestors. However, for the reasons explained below, the County and Baxter's motion to dismiss the municipal liability claim is denied.

The County and Baxter take issue with Plaintiff's reference in the Amended Complaint to the County's "Hazard Mitigation Plan," under which the County trained Sheriff's deputies to use force for both "peaceful demonstrations or acts of violence." ECF No. 1-1 ¶ 140. The County and Baxter argue that this Hazard Mitigation Plan is intended to reduce the potential impact of natural hazards and therefore "clearly has nothing to do with training for Sheriff's deputies for responding to a protest." ECF No. 12-3 at 10. However, the County and Baxter ignore the crux of Plaintiff's other allegations, which, like those against the City, detail unconstitutional municipal policies, practices, and training failures.

For example, Plaintiff alleges that Baxter and the County subscribed to a theory that Black Lives Matter protests were led by outside agitators, that violent protestors would use nonviolent

protestors as human shields, that the County and Baxter coordinated with the City and RPD to develop a protest response plan that included using disproportionate violence centered on retaliation for the message the protestors were expressing, that Baxter and the County failed to train Sheriff's deputies to meaningfully differentiate between peaceful protestors and violent ones, and instead actively trained Sheriff's deputies to treat lawful First Amendment activity the same as "violent mobs."  ECF No. 1-1 ¶¶ 143-46.  These allegations plausibly allege an unconstitutional custom or practice.

The Amended Complaint does not contain specific allegations of prior instances in which the Sheriff's Office used excessive force against protestors.  The County and Baxter argue that the absence of such allegations demonstrates that neither could have had knowledge that any problems were widespread.  However, Plaintiff *does* allege that prior to the protests which are the subject of this lawsuit, County legislators called on the Sheriff's Office to implement new training protocols to correct its deficient practices.  *Id.* ¶ 150.  Although this is a close call, the Court determines at this early stage that such factual allegations are sufficient to survive the motion to dismiss.

### D.    Third Claim: Municipal Liability for Recording – City

Plaintiff next alleges that RPD Officers used violence against her pursuant to a custom, practice, or policy of retaliating against individuals for lawfully filming them perform their duties in a public place.  ECF No. 1-1 ¶ 160.  In support of this claim, Plaintiff provides thirteen examples of past situations—as early as 2011—where RPD officers retaliated against individuals for recording them perform their duties.  *Id.* ¶ 162.

The City argues that only two of these thirteen examples serve as evidence of a custom of retaliation for recording.  ECF No. 6-2 at 9.  The other examples, the City says, fail "to provide any facts supportive of [Plaintiff's] conclusion (or a reasonable inference) that these were

retaliatory actions and the arrestees' actions did not otherwise warrant arrest." *Id.* 9-10. The Court disagrees. In each of the thirteen examples, Plaintiff suggests that the police responded to an individual recording them by either arresting, battering, or harassing them, all *because* that individual recorded the police. Accordingly, Plaintiff's Third Claim may proceed.

## II.    **Fourth Claim: Violation of Right to Monitor**

Plaintiff alleges that Defendants violated her right to record police activity, enshrined in New York's Right to Monitor Act, Civil Rights Law § 79-p. The Right to Monitor Act provides that "[a] person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity." N.Y. Civ. Rts. L. § 79-p(2). Further, it creates a private right of action for "unlawful interference with recording a law enforcement activity" when (1) "a person demonstrates that he or she exercised or attempted to exercise the right established in subdivision two" and (2) "an officer acted to interfere with that person's recording of a law enforcement activity." *Id.* at (3). An officer acts to interfere with the right to record when, *inter alia*, he or she "intentionally prevent[s] or attempt[s] to prevent that person from recording law enforcement activity." *Id.* at (3)(i).

Defendants argue that Plaintiff has not alleged that any law enforcement officer's *purpose* was to prevent Plaintiff from recording. But Plaintiff alleges that Individual Officers "shot [her] in the head with a pepper ball, *intentionally preventing her from further recording law enforcement activity*." ECF No. 1-1 ¶ 172 (emphasis added).

The City Defendants argue that Plaintiff failed to allege that she recorded or attempted to record law enforcement. ECF No. 6-2 at 11. However, Plaintiff *did* plead that she was attacked as she tried to record law enforcement. ECF No. 1-1 ¶ 53. For their part, the County Defendants argue that Plaintiff cannot simultaneously and inconsistently plead that Romano shot her for

recording while also lodging the claim against all Defendants.  To be sure, Plaintiff alleges that Romano shot her for filming; but she also alleges that other Individual Defendants attacked Plaintiff with chemical weapons and pepper balls.  Although it is a close call, at this juncture, the Court will be permit the claim to proceed as against all Defendants.

## III.    Fifth Claim: Excessive Force

Plaintiff's excessive force claim was brought against all Defendants.  The City Defendants do not move to dismiss this claim.

To the extent Plaintiff asserts her excessive force claim against Baxter, that claim will not be dismissed.  "A supervisory defendant must have been personally involved in a constitutional deprivation to be held liable under § 1983." *Bryant v. Ciminelli*, 267 F. Supp. 3d 467, 475 (W.D.N.Y. 2017).  The Amended Complaint contains no allegations that Baxter personally used excessive force on Plaintiff.  However, as explained below, Plaintiff alleges that unknown Sheriff's deputies used excessive force against her in the form of chemical weapons.  The Second Circuit has recognized "the appropriateness of maintaining supervisory personnel as defendants in lawsuits stating a colorable claim until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability."  *Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir. 1998).  Accordingly, the Court will not dismiss Baxter from the case until Plaintiff has an opportunity to conduct discovery as to the identities of the Sheriff's deputies.  If such discovery reveals the identifies of the Sheriff's deputies, Baxter may again move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or 56.  *Murphy v. Goord*, 445 F. Supp. 2d 261 (W.D.N.Y. 2006) (denying supervisor's motion to dismiss so that plaintiff could conduct discovery to ascertain identity of John Doe defendants).

The remaining County Defendants argue that the claims against individual, unnamed sheriffs must be dismissed because Plaintiff's allegations constitute impermissible "group pleading" and that Plaintiff has not alleged that County Defendants used the requisite force.  ECF No. 12-3 at 16-17.

First, the County Defendants argue that Fourth Amendment liability is premised on the use of "excessive force when detaining or arresting individuals," and that the Amended Complaint contains no allegation that any County Defendant used excessive force against Plaintiff during her arrest.  *Id.*; *see Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).

But, at this stage, Plaintiff has adequately alleged that Sheriff's Deputies—and other Individual Officers—used military-grade weapons and chemical weapons against her, causing psychological and bodily injuries and damaging her reproductive system.  ECF No. 1-1 ¶¶ 37-38.  Courts have routinely concluded that the use of such weapons against protestors constitutes a seizure for purposes of the Fourth Amendment.  *See Edrei v. Maguire*, 892 F.3d 525, 540-42 (2d Cir. 2018) ("Our sister circuits and district courts in this Circuit have routinely applied excessive force principles to crowd control situations.").

The County Defendants argue that Plaintiff tacked on allegations of Sheriff's Deputies using excessive force in an attempt to draw unnamed law enforcement officers into the allegations.[4]  ECF No. 12-3 at 16-17.  A complaint that "lump[s] all the defendants together in each claim provid[es] no factual basis to distinguish their conduct . . . . fail[s] to satisfy [the] minimum [pleading] standard."  *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (internal quotations omitted).  But Plaintiff has not lumped all Defendants'

---

[4] The County Defendants repeat this same argument as a reason to dismiss each claim.  For the same reasons outlined below with respect to the excessive force claim, the Court finds this argument unpersuasive as a basis to dismiss the remaining claims.

conduct together.  Rather, she specifically claims that unknown Sherriff's Deputies used chemical weapons on her during the protest.  That is a narrow allegation regarding an as-of-yet unknown deputy or deputies.  Given the presence of law enforcement from multiple jurisdictions at the protests, such a claim is not implausible.  The Court will permit Plaintiff to conduct discovery to determine the identities of any such Sheriff's Deputies.

## IV.    Sixth Claim: Assault & Battery

The County Defendants move to dismiss the Sixth Claim for assault and battery for the same reasons they move to dismiss the Fifth Claim for excessive force.  Again, the City Defendants do not move to dismiss this claim.  "Courts in the Second Circuit have found that [f]ederal excessive force claims and state law assault and battery claims against police officers are nearly identical." *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017) (internal quotation marks omitted).  Therefore, for the same reasons articulated above, the County Defendants' motion to dismiss the Sixth Claim for assault and battery is denied.

## V.    Seventh Claim: First Amendment Infringement & Retaliation

The Amended Complaint advances two theories of First Amendment liability: (a) that Defendants "retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment" and (b) that Defendants "imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting Plaintiff to excessive force, in arresting [P]laintiff, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights."[5]  ECF No. 1-1 ¶ 202.

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially

---

[5] It is unclear whether these two theories are distinct.  Plaintiff does not appear to allege viewpoint discrimination.

caused by his exercise of that right; and (3) the defendant's actions caused him some injury."

*Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Defendants do not seriously contest the first two elements, focusing instead on the third. To that end, Defendants argue that Plaintiff has not established any constitutional injury because Plaintiff has not alleged any specific instances in which she desired to exercise her First Amendment rights but could not or would not because of Defendants' conduct.  In other words, Defendants say that their conduct did not stop Plaintiff from protesting.

To be sure, Plaintiff returned to the protests over several days.  However, at the very least, the Amended Complaint intimates that Plaintiff was prevented from further protesting while she was being attacked.

County Defendants again argue that, because Plaintiff alleges that Romano shot her based on her speech, no claim can lie against them.  But that is not the only injury Plaintiff alleges. Plaintiff also alleges that Individual Defendants used chemical weapons on her in retaliation for her speech.  At this stage, at least, Plaintiff's First Amendment claims may proceed.

## VI.    Eighth Claim: Failure to Intervene – Individual Officers

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Allen v. City of New York*, 480 F. Supp. 2d 689, 694 (S.D.N.Y. 2007) (quoting another source).  To state a claim against an officer for his or her failure to intervene, a plaintiff must allege facts demonstrating that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) [the officer knew] that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene."  *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).

Defendants argue first that Plaintiff has failed to plead the second element—that they knew that Plaintiff's constitutional rights were being violated.  Although this claim in the Amended Complaint does not contain the words "knew" or "knowledge," it does state facts sufficient to infer knowledge.  For example, the Amended Complaint contains facts suggesting that Individual Officers were in close proximity to the alleged constitutional violations as they were occurring and were therefore aware of them; indeed, Plaintiff alleges that Individual Officers shot Plaintiff "from close range."  *See* ECF No. 1-1 ¶ 181.  These allegations are sufficient to proceed to discovery. *Weaver v. City of New York*, No. 13-CV-20 CBA SMG, 2014 WL 950041, at *7 (E.D.N.Y. Mar. 11, 2014) ("Because [plaintiff's] complaint alleges facts from which this Court could reasonably infer that at least one of the defendants had reason to know that [plaintiff] was being unjustifiably arrested, her claim may proceed.").

To the extent Defendants argue that a failure to intervene claim cannot lie against law enforcement officers who also engaged in the underlying constitutional violation, this is a misreading of the facts and law.  Plaintiff alleges multiple constitutional violations, and it is possible that a defendant directly participated in one constitutional violation while he failed to intervene in another.  Moreover, "the plaintiff is allowed to plead in the alternative" and "the alternative claims need not be consistent."  *Breton v. City of New York*, 404 F. Supp. 3d 799, 814 (S.D.N.Y. 2019) (declining to dismiss failure to intervene claim on the basis that defendant "directly participated in both the arrest and prosecution and therefore could not have intervened").

## VII.    Ninth Claim: Negligent Training, Supervision, and Discipline – Baxter

"It is well-settled under New York law that a sheriff may not be held vicariously liable for the torts committed by its employees while they are performing a criminal justice function."  *Ryan v. Moss*, No. 11-CV-6015P, 2013 WL 956722, at *18 (W.D.N.Y. Mar. 12, 2013).  There is no

question that the Sheriff's Deputies here were performing a criminal justice function during the protests.

However, in contrast to *respondeat superior* liability, "a sheriff *may* be held liable for his own negligent conduct, including a failure to train or supervise his subordinates." *Id.* at *19 (emphasis added); *see Cash v. Cnty of Erie*, No. 04-CV-182C(F), 2007 WL 2027844, at *5 (W.D.N.Y. July 11, 2007) ("[A] cause of action sounding in negligence is legally sustainable against a [sheriff] when the injured party demonstrates that he was injured due to the negligent training and supervision of a law enforcement officer.").

Baxter argues that he cannot be held liable for his own alleged negligent conduct if the Sheriff's deputies were acting outside the scope of their employment.  This argument conflates the unique standard for a sheriff's liability under a negligent training, supervision, and discipline theory, with the standard for other municipal employers, such as the City.  Baxter's argument, therefore, is misplaced.

So too is Baxter's argument that the Amended Complaint is devoid of allegations that Baxter was ever aware of any supervision or training failures. ECF No. 12-3 at 25.  As explained above with respect to *Monell* liability, Plaintiff has alleged that Baxter took "no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities," ECF No. 1-1 ¶ 99, and that Baxter failed to train Sheriff's Deputies on how to distinguish peaceful protests from acts of violence and how they should respond to each differently, *id.* ¶ 100.  Accordingly, Baxter's motion to dismiss the negligent training, supervision, and discipline claim is denied.

## VIII.   Tenth Claim: Negligent Planning – Baxter

Plaintiff asserts a claim against Baxter for his own negligent planning of the protest response.  Baxter and Plaintiff appear to agree that a "special duty" is required to establish a

17

negligence claim against Baxter, but Baxter argues that Plaintiff has not established that Baxter owed a "special duty" to Plaintiff and that the absence of such a "special duty" is fatal to her claim. The Court agrees with Baxter that Plaintiff must allege a "special duty," but it concludes that—at least for purposes of this motion to dismiss—Plaintiff has done so.

"When a negligence claim is asserted against a municipality or its employees, the threshold inquiry is whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose." *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting another source). "A municipality performs a governmental function when its acts are undertaken for the protection and safety of the public pursuant to the general police powers." *Id.* at 134-35. "Where, as here, a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.* at 135. It is Plaintiff's burden to establish a special relationship and "where the plaintiff fails to meet this burden, the analysis ends and liability may not be imputed to the municipality that acted in a governmental capacity." *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 426 (2013).

> To establish such a special relationship, Plaintiff must plead four elements:
>
> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Id.*

The New York Court of Appeals recently confirmed that "plaintiffs must establish that a municipality owed them a special duty when they assert a negligence claim *based on actions taken by a municipality acting in a governmental capacity*." *Ferreira v. City of Binghamton*, No. 10,

18

2022 WL 837566, at *1 (N.Y. Mar. 22, 2022) (emphasis added).  In *Ferreira*, the Second Circuit

certified the following question to the New York Court of Appeals:

> Does the "special duty" requirement—that, to sustain liability in negligence against
> a municipality, the plaintiff must show that the duty breached is greater than that
> owed to the public generally—apply to claims of injury inflicted through municipal
> negligence, or does it apply only when the municipality's negligence lies in its
> failure to protect the plaintiff from an injury inflicted other than by a municipal
> employee?

*Id.* at *2.  The New York Court of Appeals answered that a plaintiff must plead a special duty even

where, as here, Plaintiff alleges injury from a municipal employee's direct negligence, rather than

from a municipality's failure to protect Plaintiff from some third party.  It explained that a rule,

like that advanced by Plaintiff "purporting to draw a distinction between those negligence claims

alleging injuries inflicted by municipal actors and those in which the injury is alleged to be inflicted

by a nongovernmental actor [ ] is belied by our precedent, unworkable, and contrary to the public

policies upon which the special duty requirement is founded."  *Id.* *6.  Accordingly, Plaintiff must

establish a special duty to survive a motion to dismiss the negligent planning claim.

Here, Plaintiff alleges that Baxter "had a special duty to ensure that the rights of Plaintiff

and other protestors to free speech, expression and to assemble under Article I, section 8 of the

New York State Constitution were not violated, and that protestors were not assaulted, battered,

and subjected to excessive force and/or falsely arrested by law enforcement."  ECF No. 1-1 ¶ 225.

Although courts have not specifically found that a special duty arises in these circumstances,

*Ferreira* is instructive.

There, the police obtained information that Michael Pride—a suspect who police believed

to be armed and dangerous—resided at a certain apartment in Binghamton.  *Ferreira*, 2022 WL

837566, at *1.  The police obtained a no-knock warrant for the residence, surveilled the residence,

and observed Pride leave the residence.  The police never saw Pride return to the apartment or

conduct additional surveillance.  But because the police believed Pride to be heavily armed and dangerous, the following morning, they executed the no-knock warrant with a SWAT team.  Upon entry, the police encountered plaintiff, who was unarmed, and shot him in the stomach.  Plaintiff sued Binghamton and the police department in federal court, alleging that defendants were negligent in planning the raid.  *Id.* *2.  A jury determined that Binghamton was negligent and it appealed to the Second Circuit, which certified the "special duty" question to the New York Court of Appeals.  As explained above, the New York Court of Appeals determined that a plaintiff must establish a "special duty" when suing a municipality in negligence for an injury it directly inflicted. But the court noted that "because the underlying premise of the certified question appears to be that a special duty could not be established in a scenario like the one presented, we take this opportunity to clarify that this is not the case: a special duty may be established where the police plan and execute a no-knock search warrant on a targeted residence."  *Id.* at *8.

The court explained that execution of a no-knock warrant raises a "special duty" because "when police plan and execute a no-knock warrant, they effectively take control of the targeted premises, knowingly creating an unpredictable and potentially dangerous condition at a particular premises."  *Id.*  at *9.  The court further explained that

> [i]n a no-knock warrant situation, the police exercise extraordinary governmental power to intrude upon the sanctity of the home and take temporary control of the premises and its occupants. In such circumstances, the police direct and control a known and dangerous condition, effectively taking command of the premises and temporarily detaining occupants of the targeted location. As a result, the municipality's duty to the individuals in the targeted premises, a limited class of potential plaintiffs, exceeds the duty the municipality owes to the members of the general public. A special duty therefore arises when the police plan and execute a no-knock search warrant at an identified residence, running to the individuals within the targeted premises at the time the warrant is executed. In other words, in those circumstances, the police take positive control of a known and dangerous condition, creating a special duty under the third situation recognized by this Court.

*Id.*

Although this case does not present the no-knock situated addressed in *Ferreira*, there are some compelling similarities.  Indeed, like executing a no-knock warrant, law enforcement responding to a protest may in some senses take "positive control of a known and dangerous condition"—one that is dynamic, potentially dangerous, and buttressed by constitutional protections.  That is what Plaintiff alleges here.  *See, e.g.*, ECF No. 1-1 ¶ 55 (alleging that police "kettled and trapped [Plaintiff] and hundreds of other protestors").  Neither party cites cases—let alone any cases post-*Ferreira*—addressing the unique facts presented here.  Given *Ferreira*'s reasoning and the absence of case law confirming that a special duty does or does not exist under these unique circumstances, the Court concludes that Plaintiff's claim, at this early stage, may proceed.  While the Court cannot say with certainty that a special duty exists in the circumstances presented by Plaintiff here, the Court finds that Plaintiff's allegations are sufficient to survive Defendants' motion to dismiss.[6]

## IX.    Eleventh Claim: Negligent Training, Supervision, and Discipline – City

The City moves to dismiss this claim and Plaintiff does not appear to oppose dismissal.  "To maintain a claim against a municipal employer for the negligent hiring, training, and retention of a tortfeasor under New York law, a plaintiff must show that the employee acted outside the scope of her employment.  If the employee acted within the scope of her employment, the employer

---

[6] Baxter does not argue that he cannot be held liable for this negligent planning claim under a theory of *respondeat superior*, as in the negligent training, supervision, and discipline claim.  The parties do not distinguish Baxter's own alleged negligent actions in failing to properly plan the protest response from the negligent actions of his employees.  Nor do they argue that the "special duty" requirement does not apply to Baxter because, as sheriff, he is not a municipality.  Accordingly, the Court declines to engage further in any such analysis.  *Zannino*, 895 F.2d 1, 17 (1st 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

and the employee's supervisors may be held liable for the employee's negligence only under a theory of *respondeat superior*."[7]  *Velez*, 730 F.3d at 136 (internal quotation marks omitted).

Here, the Amended Complaint states that "[a]t all relevant times" the RPD Officers "were acting within the scope of their employment."  ECF No. 1-1 ¶ 4.  Therefore, there can be no claim for negligent training, supervision, and discipline against the City, and the City's motion to dismiss that claim is granted.

## X.     Twelfth Claim: Negligent Planning – City

Plaintiff alleges the existence of a special duty flowing from the City to the protestors.  ECF No. 1-1 ¶ 244 ("The CITY had a special duty to ensure that the rights of Plaintiff and other protestors to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution were not violated, and that protestors were not assaulted, battered, or subjected to excessive force and/or falsely arrested by law enforcement.").  For the same reasons articulated above with respect to Baxter, the City's motion to dismiss the negligent planning claim is denied.

## XI.    Thirteenth Claim: Negligence – Individual Officers

Plaintiff alleges that Individual Officers are liable under a negligence theory on the basis that they had duties to "permit the protestors to engage in First Amendment Activities" and "not use force against any individual protestor in the absence of individualized cause or legal justification," and that they breached those duties.  ECF No. 1-1 ¶¶ 261-64.  However, the conduct alleged is the same conduct for which Plaintiff asserts their battery, failure to protect, and excessive force claims.  As discussed above, a plaintiff may plead in the alternative, but where, as here, they only allege intentional conduct—such as for battery or excessive force—"[they] fail[] to state negligence."  *Strobridge v. City of Elmira*, No. 20-CV-1125S, 2022 WL 597464, at *11 (W.D.N.Y.

---

[7] Notably, this standard is different than the standard for negligent training, supervision, and discipline against a county sheriff, as described above.

Feb. 28, 2022).   Accordingly, Plaintiff's negligence claims against individual defendants are dismissed.

## CONCLUSION

For the reasons explained above, Defendants' motions to dismiss, ECF Nos. 6, 12, are GRANTED IN PART and DENIED IN PART.  Plaintiff's Eleventh Claim for negligent training, supervision, and discipline against the City and Plaintiff's Thirteenth Claim for negligence against Individual Officers are dismissed; the remaining claims may proceed.

IT IS SO ORDERED.

Dated: November 10, 2022
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York